NEM:SMS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF
ONE SAMSUNG MOBILE PHONE WITH
IMEI NUMBER 350091128427189,
CURRENTLY LOCATED IN LAW
ENFORCMENT CUSTODY IN THE
EASTERN DISTRICT OF NEW YORK

**TO BE FILED UNDER SEAL**

**APPLICATION FOR A SEARCH
WARRANT**

Case No. 24-MC-1482

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
### RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Stephanie Kooharian ("SA Kooharian"), being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—the electronic device that is described in Attachment A—which is currently in law enforcement's possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I have been employed as a Special Agent ("SA") with Homeland Security Investigations ("HSI") since May 2021, and am currently assigned to the HSI office of the Resident Agent in Charge in New Haven, CT. Prior to my employment with HSI, I was a Detective with the Manchester, New Hampshire Police Department from 2016 to 2021. Additionally, I was a Police Officer with the Central Intelligence Agency from 2014 to 2016 and the United States Capitol Police from 2012 to 2014. I graduated from the New Hampshire Police Standards and Training Academy Class 172, the Uniformed Police Training Program at the Federal Law Enforcement Training Center ("FLETC") Class 212, and the Criminal Investigator Training

Program at the FLETC Class 2204. I have received training from the Manchester, New Hampshire Police Department, New Hampshire Police Standards and Training full-time Police Academy, United States Capitol Police, Central Intelligence Agency, and the FLETC. I have also received additional training from other police agencies pertaining to the continued investigations of criminal activity. I have gained experience through training at the HSI Special Agent Training course and everyday work relating to conducting these types of investigations. I have received training in money laundering and trafficking in counterfeit goods and services.

3.      The statements contained in this affidavit are based in part on information provided by other members of local, state, and federal law enforcement, my own investigation to include personal observations, documents and other investigative materials which I have reviewed, as well as my training and experience as a Special Agent with HSI. Since this affidavit is being submitted for the limited purpose of obtaining criminal complaints, arrest warrants, and a search and seizure warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested search warrant.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

4.      The property to be searched, as described in Attachment A, is a Samsung mobile phone with International Mobile Equipment Identity ("IMEI") number 350091128427189, hereinafter the "SUBJECT DEVICE." The SUBJECT DEVICE is currently located in the Eastern District of New York.

5.      Based on the information set forth in this affidavit, I believe there is probable cause that the SUBJECT DEVICE constitutes and contains items that constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2320 (trafficking in and conspiring to traffic in

2

counterfeit goods or services) and 18 U.S.C. § 1956 (money laundering) (collectively, the "SUBJECT OFFENSES"), as further described in Attachment B.

6.    The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

## FACTS ESTABLISHING PROBABLE CAUSE

### Background

7.    HSI, the Internal Revenue Service-Criminal Investigation ("IRS-CI"), and the United States Postal Inspection Service ("USPIS") are currently investigating the following individuals for selling and conspiring to sell counterfeit luxury and designer brand watches through several websites and social media accounts that they operated:

    a.    IZEDIN KIMCA ("KIMCA"), an adult male born in 1999, who resides with his wife and parents in Waterbury, Connecticut;

    b.    DENIS NAKO ("D. NAKO"), an adult male born in 1999, who resides with his parents and his brother, Klevis Nako, in Worcester, Massachusetts;

    c.    KLEVIS NAKO ("K. NAKO"), an adult male born in 2000, who resides with his parents and brother D. NAKO in Worcester, Massachusetts; and

    d.    SI MAN LAM ("LAM"), an adult female born in 1983, who resides in Brooklyn, New York. As explained below, LAM is the user of the SUBJECT DEVICE.

8.    On April 3, 2024, KIMCA was arrested on a federal criminal complaint and arrest warrant issued in the District of Connecticut charging him with trafficking in and conspiring to traffic in counterfeit goods or services, in violation of 18 U.S.C. § 2320, and knowingly engaging in a monetary transaction greater than $10,000.00 derived from specified unlawful activity, in

3

violation of 18 U.S.C. § 1957. See United States v. Izedin Kimca, Case No. 3:24-mj-292 (MEG) (D. Conn.). The same day, D. NAKO and K. NAKO also were arrested on federal criminal complaints and arrest warrants issued in the District of Connecticut charging them with trafficking in and conspiring to traffic in counterfeit goods or services, in violation of 18 U.S.C. § 2320. See United States v. Denis Nako, Case No. 3:24-mj-293 (RAR) (D. Conn.); United States v. Klevis Nako, Case No. 3:24-mj-294 (RAR) (D. Conn.).

Seizures of Counterfeit Watches

9.      Beginning in October 2021, HSI New Haven received information from the National Intellectual Property Rights Coordination Center ("IPRC")[1] that U.S. Customs and Border Protection ("CBP") had seized at John F. Kennedy International Airport ("JFK Airport") two parcels that CPB found to contain 18 counterfeit Rolex, Audemars, and Panerai watches[2] from Hong Kong that CPB estimated to have a combined manufacturers' suggested retail price ("MSRP") value of approximately $385,000, had the watches been authentic.[3] The seized parcels were addressed to KIMCA's residence in Waterbury, Connecticut. Additional records obtained from CBP indicate that from April 2020 to July 2022, CBP seized approximately 74 parcels

---

[1]      The IPRC is led by U.S. Immigration and Customs Enforcement and brings together 25 federal and international agencies in a task force to combat intellectual property crimes.

[2]      Based on my training and experience, I am aware that Rolex, Audemars, and Panerai are manufacturers of luxury watches.

[3]      According to information provided to me by a CBP officer at the JFK Airport mail facility, CPB officers receive training specifically related to identifying counterfeit merchandise. These trainings include, but are not limited to, representatives from companies conducting in person trainings to train officers in detecting counterfeit markings and determining if an item is counterfeit. Additionally, companies such as Rolex, will provide bulletins and literature to CBP with information on how to identify counterfeit merchandise. In order to determine the MSRP of an item, CBP utilizes several methods, which include, but are not limited to, looking at the price of an item on the manufacturer's website, reviewing previous seizures of similar items, and at times, contacting the manufacturer.

addressed to KIMCA's residence or other known addresses for KIMCA. The seized parcels contained counterfeit luxury watches, and CBP estimated the MSRP value of the seized counterfeit luxury watches was approximately $16.2 million, had the watches been authentic.

10.     In addition, according to a search of government databases, CBP seized numerous parcels of counterfeit watches addressed to the prior residence of D. NAKO and K. NAKO, where they lived at the time, in Worcester, Massachusetts: [4]

a.     On February 23, 2021, CBP seized a parcel addressed to D. NAKO at a residence where D. NAKO and K. NAKO were living at the time and listing D. NAKO's phone number on the shipping label. According to CBP, the parcel contained 10 counterfeit Rolex watches with an estimated MSRP of approximately $120,000.00.

b.     From February 2021 to April 2022, CBP seized an additional 21 parcels addressed to the same address in Worcester, Massachusetts, where D. NAKO and K. NAKO were living at the time, and listing K. NAKO's phone number. According to CBP, the parcels contained counterfeit luxury watches.

c.     The CBP estimated the total MSRP of all 22 seizures to be just over $3 million.

<u>HSI's Interview of KIMCA</u>

11.     On or about January 19, 2023, HSI SA Brendan Lundt and I interviewed KIMCA at JFK Airport when he arrived from an overseas trip. After signing a statement of rights form, KIMCA provided the following information:

---

[4]     D. NAKO and K. NAKO are currently living with their parents at a different residence in Worcester. Massachusetts.

a.      KIMCA stated he sold replica watches a few years ago, but he had a package seized and received a letter from CBP advising him of the seizure. He stated that, at the time, he was not aware it was illegal to sell replica watches. He stated he purchased the watches from China. He stated he received approximately 15 to 20 notices from CBP, addressed to the individual on the shipping labels and explaining why the items were being seized and the potential violation(s) associated with the importation of the item(s). KIMCA stated the watches he received from China had the same markings as real watches and he utilized Facebook Marketplace early on to sell "luxury watches" for approximately $140.00 to $150.00 each.

b.      KIMCA stated he would wire money via MoneyGram or Western Union to his supplier in China. After several transactions, KIMCA stated he contacted the supplier about buying in bulk to cut down the cost.

c.      KIMCA stated each package contained approximately 10 watches, which resulted in him making a profit of approximately $60.00 per watch. KIMCA stated that, at that time, he was making approximately $5,000.00 to $6,000.00 per month selling the watches.

d.      KIMCA stated he stopped selling the watches at various points because he knew it was wrong, and he attempted other businesses. KIMCA stated those other businesses were not doing well, so he began selling watches again. KIMCA stated he utilized an Instagram page (@watch.empo) and a website (watchempo.com) to sell the watches. KIMCA stated that to purchase from the website and complete the transaction, the individual would have to text him to pay via CashApp, PayPal, or other means. KIMCA stated he then sent an invoice to that individual via text message.

e.     KIMCA identified several websites and social media accounts he utilized to sell watches, which included, but were not limited to: watchfluent.co, watchempo.com, watch Slick, Pro Lux, and Luxury Time.

f.     KIMCA stated his website, Watch Slick was shut down. When I asked KIMCA why he thought the website may have been shut down, KIMCA responded, "obviously, it's a replica." KIMCA stated if "they" found out what you were doing, you would get shut down.

g.     SA Lundt and I advised KIMCA during the interview not to sell any additional watches or have anyone else sell the watches for him.  We advised KIMCA that it was not illegal to possess the watches, but it was illegal to sell them.

<u>Identification and Review of Websites and Social Media Accounts</u>
<u>Associated with KIMCA, D. NAKO, and K. KIMCA</u>

12.     On or about January 23, 2023, I visited the website watchfluent.co, which KIMCA identified in his interview, and I observed what appeared to be the advertisement and sale of counterfeit luxury watches. I subsequently searched for Instagram accounts with a similar name and located the following two publicly available Instagram accounts and observed what appeared to be the advertisement and sale of counterfeit luxury watches: watch.fleunt and watchfluent.eu.

13.     In addition, records from Namecheap.com, which provides domain registration and web hosting services, indicate that KIMCA registered the domain name watchoholics.co on November 23, 2022. I located a similar publicly available account name on Instagram, Instagram account watch.oholics, which advertised the sale of luxury brand name watches.

14.     In or around June 2023, I reviewed D. NAKO's publicly available Facebook profile and observed he was "following" a Facebook account identified as Watch Riches. I searched for a similar account name on Instagram and located the publicly available Instagram account watch.riches, which displayed the same profile picture as the Watch Riches Facebook account. On

the Instagram account, I observed what appeared to be the advertisement and sale of counterfeit luxury watches, and I viewed several posts with photos of luxury brand name watches such as Rolex.

15.     On September 28, 2023, CBP officers conducted a secondary inspection and interviewed K. NAKO at Logan International Airport in Boston, Massachusetts ("Logan Airport"), when he arrived from an overseas trip. During the inspection, CBP retrieved a cellular telephone belonging to K. NAKO and provided it to an HSI SA. The cellular telephone was placed into airplane mode prior to being turned over to the SA. The cellular telephone was then manually reviewed by the SA pursuant to HSI's border search authority, and a basic, also known as a routine search, was conducted.[5] After the manual review, the phone was returned to K. NAKO. During the manual review of K. NAKO's cellular telephone, the following was observed:

a.      Instagram account "watchfigura," which displayed a profile picture of a watch with the words "Watch Figura" surrounding the watch. Several photographs were visible, which appeared to depict counterfeit luxury watches and the sale of those watches.

b.      KIMCA was a contact in the phone, and the contact information screen for KIMCA contained approximately 80 photographs of watches, including Rolex type watches.

c.      A text conversation between K. NAKO's cellphone and a contact titled "Izedin" (which is KIMCA's first name), dated October 6, 2021, which was not in English but included a screen shot of a $595.00 money transfer to "Klevis" (which is K. NAKO's first name).

---

[5]     The person who conducted the review was a Special Agent at Homeland Security Investigations and authorized as a Customs Officer to conduct border searches under 19 U.S.C. § 1401(i) as well as 1589a Immigration and Customs Enforcement Directive No. 7-6.1, Border Searches of Electronic Devices (2009).

     d.     A text conversation between K. NAKO's cellphone and a contact titled "Eduardo Sifuentes Watch" that discussed the sale and shipping of Rolex type watches. Included within this conversation was an image of a United Stated Postal Service receipt.

     e.     LAM was a contact in the phone, and the contact information screen for LAM contained approximately 2,500 photographs of watches, including Rolex type watches. The contact information in the phone listed LAM's phone number as a phone number, known to me, ending in 0198.

     f.     A text conversation with LAM discussing the sale and shipping of Rolex type watches as well as images of United Stated Postal Service receipts and Rolex watches.

     g.     An email from K. NAKO to LAM regarding Pirateship.com, which is an online company that facilitates the creation of shipping labels and manages the tracking of shipments

16.     On or about October 6, 2023, I viewed the publicly available Instagram page watchfigura and observed photos of messages related to the shipment and sale of counterfeit luxury watches.

17.     As described below, law enforcement conducted seven undercover purchases from the following Instagram accounts and websites identified above: Instagram account Watch.oholics, website www.watchfluent.co, Instagram account Watch.riches, and Instagram account Watchfigura.

<u>Undercover Purchase #1</u>

18.     As noted above, Watch.oholics is an Instagram marketplace, publicly viewable to all Instagram users, which advertises the sale of luxury brand name watches. Watch.oholics

advises customers to send a direct message on Instagram to Watch.oholics to place an order, and it indicates that it accepts a variety of payment methods.

19.     On or about May 4, 2023, an IRS-CI undercover agent ("UCA-1"), who was located in Connecticut at the time, sent a direct message via Instagram to Watch.oholics and expressed interest in purchasing a watch. Watch.oholics responded via direct message and provided two videos displaying two watches bearing the Rolex branding. Watch.oholics described the watches as having the "same weight as the real deal, same details as the real deal[.]" After several messages between them, UCA-1 agreed to purchase a blue watch with Rolex branding.

20.     UCA-1 sent a payment of $260.00 via Zelle. As part of the Zelle payment, UCA-1 listed a shipping address, which was an undercover mailbox in Massachusetts. Watch.oholics responded via Instagram direct message confirming receipt of payment.

21.     The Zelle account listed the recipient's name as an individual I know to be one of KIMCA's parents.

22.     Later that evening, Watch.oholics sent a picture via Instagram direct message of the shipping label addressed to UCA-1 at the address UCA-1 provided. The label also had a U.S. Postal Service ("USPS") tracking number.

23.     The package, however, was never delivered. I conducted a query of the tracking number on USPS's website, which indicated that a shipping label was created in Waterbury, CT on May 5, 2023; an item was expected for mailing in Brooklyn, NY and then departed a post office in Brooklyn, NY on May 6, 2023; and the package was processed to return to sender on May 16, 2023.

24.     I subsequently contacted a U.S. Postal Inspector who verified the package was shipped with insufficient postage which caused the package to be returned to sender; however, the

return address was not a complete address which resulted in the package being sent to a USPS location in Atlanta, GA.  To date, attempts at recovering the package have been unsuccessful.

25.     Records obtained from Zelle indicate that UCA-1's payment was sent to a Zelle account registered in the name of one of KIMCA's parents. Records from Bank of America indicate that the Zelle payment from UCA-1 was then deposited into a Bank of America account ending in 7993 (the "BoA-7993" Account).  According to Bank of America records, the BoA-7993 Account is a joint checking account, and a Personal Signature Card, dated November 7, 2023, identifies KIMCA and one of KIMCA's parents as the account holders.

<u>Undercover Purchase #2</u>

26.     On or about July 7, 2023, a second IRS-CI undercover agent ("UCA-2"), who was located in Connecticut at the time, visited website www.watchfluent.co for the purpose of purchasing a men's wristwatch. As noted above, www.watchfluent.co is one of the websites KIMCA admitted he used to sell watches and is one of the websites whose domain registration records are associated with KIMCA.  UCA-2 submitted an online order, order number 4109, to purchase two identical men's Rolex wrist watches. UCA-2 entered a credit card to pay for order 4109 totaling $488.83.

27.     On or about July 8, 2023, UCA-2 received a phone call from an individual who identified himself as "Izzy." UCA-2 recorded the call.[6] During the call, Izzy informed UCA-2 he was calling from Watch Fluent. Izzy informed UCA-2 his payment failed.  Izzy stated that because it is a high-risk business, none of the United States payment processors will accept their business in the United States.  Izzy informed UCA-2 that he connected his website with a payment processor in China and some payments fail.  Izzy informed UCA-2 if he wanted to continue with the

---

[6]     UCA-2 was not in Connecticut at the time he received the call.

purchase, he would send UCA-2 an invoice and UCA-2 could provide the card number. Izzy could then complete the transaction using the payment processor Stripe.

28.     During the call, UCA-2 asked if Izzy had a store, and Izzy explained that it was impossible to have a store as he was selling replica watches.  Izzy explained he operated only online.  Izzy informed UCA-2 that the watch is not a real Rolex.  Izzy stated a real Rolex would cost $25,000.00.  Izzy explained the watches were high quality replicas.

29.     While on the phone, Izzy sent an email with the subject line "Invoice #D568" to UCA-2's email account. The email contained an order summary for one watch with box and paper for $250.00 and fees of $12.50 for a total of $262.50 and a note to "Complete your purchase" followed by an internet link to "Visit our store."

30.     On or about July 12, 2023, UCA-2, while in Connecticut, clicked on the link and completed the order to purchase a men's Rolex wristwatch.  UCA-2 entered a credit card number to pay $262.50. UCA-2 provided an undercover mailbox in New York as the shipping address, and upon submitting the order, the website displayed a message confirming the order. That afternoon, UCA-2 received an email containing a USPS tracking number and indicating that the package was shipped on July 12, 2023.

31.     On or about July 17, 2023, UCA-2 and IRS-CI Special Agent Jonathan Simon went to the United Parcel Service ("UPS") store in New York where the undercover mailbox was located and retrieved the package. SA Simon subsequently brought the package from the UPS store to the IRS-CI New Haven office, where it was opened. The package contained a men's wristwatch that was gold and silver in color and branded with the name Rolex, a green box branded with the name Rolex, a green and gold shopping bag branded with the name Rolex, a package containing a credit card sized card branded with the name Rolex, a piece of paper identifying a one year warranty

branded with the name Rolex, a cleaning cloth, and a green credit card sized wallet branded with the name Rolex.

32.     On or about July 24, 2023, Special Agents from IRS-CI and HSI met with an estimator at Rolex, Inc. and provided him with the watch purchased by UCA-2. The estimator inspected the watch and packaging to determine if it was a counterfeit watch. On or about August 17, 2023, HSI received a sworn affidavit signed by the estimator indicating that the watch was "a non-genuine Rolex watch. The appearance of the Watch is such that it could very easily mislead a customer to believe that this is a genuine Rolex Datejust." According to the affidavit, the Watch contained a non-genuine copy of the Rolex "Crown Device" on the dial and the watch was not manufactured by Rolex.

33.     In addition, according to a publicly available database on the U.S. Patent and Trademark Office ("PTO"), Rolex owns numerous trademarks registered with the PTO, including, but not limited to, the trademarks and trade names Rolex and the Crown Device (design).

34.     As noted above, in the phone call that Izzy placed to UCA-2, Izzy indicated that the credit card payment would be processed by Stripe. According to records provided by Stripe, UCA-2's payment was processed by a Stripe account registered in the name of "Izzys Store LLC dba SP AIZ Aparts LLC" and listed the representative as one of KIMCA's parents.  The records indicate a subsequent transfer of money in excess of the purchase from the Stripe account to a Bank of America bank account ending in 8581 (the "BoA-8581 Account").[7] According to records provided by Bank of America, the Business Signature Card, dated December 22, 2022, identified the account as being in the name of Izzy's Store LLC and one of KIMCA's parents.

---

[7] Stripe appears to maintain an account balance which users can choose to disburse amounts to bank accounts.  The amount disbursed is believed to be from several individual purchases.

<u>Undercover Purchase #3</u>

35.     As described above, the Instagram account Watch.oholics is associated with KIMCA, and payment for a prior attempted undercover purchase from this Instagram account was ultimately deposited into a bank account associated with KIMCA. As explained below, on November 30, 2023, law enforcement conducted another undercover purchase from Watch.oholics, but this time the payment was deposited into a bank account associated with D. NAKO.

36.     More specifically, on November 30, 2023, UCA-2 sent a direct message via Instagram to Watch.oholics asking if there was a silver Rolex available.  Watch.oholics responded providing eight photos containing numerous watches per photo.  UCA-2 agreed to purchase a watch bearing a green watch face with Rolex branding. UCA-2 indicated his preferred method as Zelle.  Watch.oholics provided the total payment to be $270.00 and a phone number for the Zelle payment.

37.     On December 2, 2023, Watch.oholics sent UCA-2 a direct message through Instagram asking if everything was okay. On December 4, 2023, UCA-2 responded and informed Watch.oholics he was about to send the Zelle payment to Phone Number 0519.  UCA-2 informed Watch,oholics that Zelle was indicating that the phone number that Watch.oholics provided for the Zelle payment was enrolled as Nakos Motors, Inc.  Watch.oholics responded and confirmed the Zelle name to be correct. UCA-2, while he was in Connecticut, then completed the payment through Zelle and provided a shipping address, which was an undercover mailbox in New York.

38.     Later that day, Watch.oholics sent UCA-2 a direct message via Instagram containing a photo of the shipping label and a tracking number.  The shipping label identified the shipping address provided by UCA-2 but listed the wrong unit and listed the return sender as an

individual named Ardit Mesi and an address known to me in Brooklyn, NY (the "Brooklyn Address"). UCA-2 informed Watch.oholics of the error and a new shipping label was sent to UCA-2. The new shipping label corrected the shipping address and listed the same return sender name and address.

39.     On December 8, 2023, the package was delivered to the undercover mailbox in New York that UCA-2 provided as the shipping address. On December 11, 2023, UCA-2 mailed the package to IRS-CI SA Simon, who received and opened the package the next day. The package contained a green bag with gray markings bearing Rolex branding, a green watch box bearing Rolex branding, a silver watch with a green face bearing Rolex branding and package of papers in a wallet which contained several documents bearing Rolex branding.

40.     On or about December 15, 2023, Special Agents from IRS-CI and HSI met with an estimator at Rolex, Inc., and provided him with the watch that UCA-2 purchased from Watch.oholics to determine if it was a counterfeit watch. On or about December 20, 2023, HSI received a sworn affidavit signed by the estimator indicating that the watch was a non-genuine Rolex watch.

41.     According to records provided by Zelle, UCA-2's payment was sent to a Zelle account registered in the name of Nakos Motors Inc. Records provided by Bank of America indicate that the Zelle payment from UCA-2 was then deposited into Bank of America account ending in 9377 (the "BoA-9377 Account") in the name of Nakos Motors INC. The Signature Card, signed on September 9, 2021, lists D. NAKO as the signatory.

42.     The website for the Secretary of State of Massachusetts identifies D. NAKO as having registered Nako's Motors on September 1, 2021, and having since filed for dissolution on

December 29, 2023.  D. NAKO was listed as the President, Treasurer, Secretary and Director of Nako's Motors.

<u>Undercover Purchase #4</u>

43.     On November 20, 2023, a third undercover agent ("UCA-3"), who was in Connecticut at the time, sent a direct message to Instagram account watch.riches asking what model Rolex watches were for sale.  Watch.riches responded by providing seven photos of watch cases containing a number of watches bearing luxury brands and additional photos of individual watches bearing luxury brands.  UCA-3 informed Watch.riches that UCA-3 liked the Pepsi GMT II watch with jubilee bracelet.  Watch.riches responded with a video and photo of the watch. Watch.riches provided a price of $210.00 without a box and $280 with a box.

44.     UCA-3 indicated he was choosing Zelle as the payment method and requested delivery via USPS Express. Watch.riches indicated the total due was $296.00. Watch.riches provided a phone number and "Nakos Motors" to make the Zelle payment. Watch.riches also provided the following instructions: "PLEASE DO NOT WRITE BRAND NAMES ON THE TRANSACTION LIKE ROLEX, CARTIER etc, You can write 'GOODS.'"

45.     UCA-3 made the payment via Zelle, provided an undercover mailbox in New York as the shipping address, and sent Watch.riches a screenshot depicting the payment via Zelle. Watch.riches responded by indicating the payment was received, thanking him/her for business, and providing a photo of the shipping label.  The shipping label identified the return sender as Ardit Mesi at the Brooklyn Address, which was the same return sender information that was on the shipping label for Undercover Purchase #3, discussed above. The shipping label also had a tracking number.

46.     The shipment was delivered to the undercover mailbox on November 22, 2023, which UCA-3 subsequently retrieved. On December 1, 2023, IRS-CI SA Simon went to UCA-3's office and took possession of the watch from UCA-3. On December 6, 2023, SA Simon opened the package, which contained a green bag with gray markings bearing Rolex branding, a green watch box bearing Rolex markings, a silver-colored watch with black face and blue and red bezel bearing Rolex branding, and a credit card sized package containing documents bearing Rolex branding.

47.     On or about December 15, 2023, Special Agents from IRS-CI and HSI met with an estimator at Rolex, Inc. and provided him with the watch purchased by UCA-3 to determine if it was a counterfeit watch. On or about December 20, 2023, HSI received a sworn affidavit signed by the estimator indicating that the watch was a non-genuine Rolex watch.

48.     According to records from Zelle and Bank of America, UCA-3's payment of $296.00 was sent to the same Zelle account in the name of Nakos Motors INC that the payment for Undercover Purchase #3 from Watch.Oholics was sent to, and the money was then deposited into the same Bank of America account, the BoA-9377 Account, in the name of Nakos Motors INC with D. NAKO as the signatory on the account.

<u>Undercover Purchase #5</u>

49.     On November 21, 2023, a fourth undercover agent ("UCA-4") sent a direct message on Instagram to account watchfigura asking if there were any Rolexes available. Watchfigura responded in the affirmative and provided more than 90 photos containing watches bearing luxury branding. UCA-4 agreed to purchase a silver watch with black face and bezel bearing Rolex branding with box and papers, and Watchfigura indicated the price was $310.00.

50.     Watchfigura asked if UCA-4 had Zelle and UCA-4 responded in the affirmative. Watchfigura provided K. NAKO's phone number to pay via Zelle.  Watchfigura informed UCA-4, "Do not write rolex or replica at the notes its copyright."

51.     UCA-4, while in Connecticut, submitted payment via Zelle and informed Watchfigura the payment was conducted.  Watchfigura confirmed receipt of the payment and asked for a shipping address.  UCA-4 provided the address of an undercover mailbox in Pennsylvania as the shipping address.

71.     On November 27, 2023, UCA-4 received the package from Watchfigura and shipped the package via UPS to IRS-CI SA Simon.  SA Simon received the package the next day and opened it on November 29, 2023. The package contained a green bag with gray marking bearing Rolex branding, a green watch box bearing Rolex branding, a watch with a silver-colored band, black bezel and black face bearing Rolex branding, and a credit card sized package containing several documents bearing Rolex branding.

72.     On or about December 15, 2023, Special Agents from IRS-CI and HSI met with an estimator at Rolex, Inc. and provided him with the watch purchased by UCA-4 to determine if it was a counterfeit watch. On or about December 20, 2023, HSI received a sworn affidavit signed by the estimator indicating that the watch was a non-genuine Rolex watch.

73.     According to records provided by Zelle, UCA-4's payment was transmitted to a Zelle account registered in the name of K. NAKO. According to records provided by Bank of America, the Zelle payment was then deposited into a Bank of America account ending in 1153, and the Personal Signature Card, dated April 6, 2021, identified K. NAKO as the account holder.

74.     The shipping label on the package that UCA-4 received from Watchfigura listed a return address in Holden, Massachusetts.

<u>Undercover Purchase #6</u>

75.     On March 28, 2024, a fifth undercover agent ("UCA-5"), sent a direct message to Instagram account watch.riches seeking to purchase a Rolex watch.  Watch.riches responded by providing photos of watches, and UCA-5 agreed to purchase a green watch with a jubilee band. UCA-5 chose Zelle as the payment method and requested delivery via USPS Priority. Watch.riches indicated the total due was $210.00. Watch.riches provide a phone number and "Nakos Motors" as the Zelle payment information. Watch.riches also provided the following instructions: "PLEASE DO NOT WRITE BRAND NAMES ON THE TRANSACTION LIKE ROLEX, CARTIER etc, You can write 'GOODS.'"

76.     UCA-5 made the payment via Zelle and provided an undercover mailbox in Hartford, Connecticut, as the shipping address. Watch.riches provided a photo of the shipping label.  The shipping label identified the return sender as Ardit Mesi at the Brooklyn Address, which was the same return sender information that was on the shipping label for some of the prior undercover purchases, discussed above. The shipping label also had a tracking number.

77.     According to USPS tracking information, the package was shipped from Auburn, Massachusetts, and was delivered to the undercover mailbox in Hartford, Connecticut on or about March 30, 2024. Law enforcement subsequently retrieved and opened the package, which contained what appears to be a counterfeit Rolex watch. Law enforcement has not yet provided the watch to an estimator at Rolex, Inc. to determine if the watch is counterfeit.

<u>Undercover Purchase #7</u>

78.     On March 29, 2024, a sixth undercover agent ("UCA-6"), sent a direct message to Instagram account watchfigura to purchase a Rolex watch. UCA-6 exchanged communications with watchfigura and agreed to make a purchase for $240. UCA-6 indicated he wanted to pay by

Zelle. Watchfigura provided K. NAKO's phone number to pay via Zelle.  Watchfigura informed UCA-6, "Do not write rolex or replica at the notes it's the brand, model or replica at the notes that is copyright."

79.     UCA-6 made the payment via Zelle and provided an undercover mailbox in New Haven, Connecticut, as the shipping address. UCA-6 took a screenshot of his Zelle payment of $240. The Zelle application displayed K. NAKO as the payee.

80.     The package was delivered to the undercover mailbox in New Haven, Connecticut on or about April 2, 2024. Law enforcement subsequently retrieved and opened the package, which contained what appears to be a counterfeit Rolex watch. Law enforcement has not yet provided the watch to an estimator at Rolex, Inc. to determine if the watch is counterfeit. The package had a shipping label with a USPS tracking number. According to USPS tracking information, the package was shipped from Auburn, Massachusetts. The shipping label identified the return sender as "KN" (which are the initials of K. NAKO) at the Brooklyn Address.

<u>Additional Interactions Between KIMCA, D. NAKO, K. NAKO, and LAM</u>

81.     An analysis of phone records showed that from October 2021 through early December 2023, D. NAKO's phone number contacted KIMCA's phone number approximately 1,580 times. The analysis also showed that from December 2021 to early October 2023, K. NAKO's phone number contacted KIMCA's phone number approximately 51 times.

82.     During the investigation, bank and other financial records were obtained for accounts in the name of KIMCA, his parents, Izzy Store LLC, D. NAKO, K. NAKO, and Nakos Motors, INC. As noted above, D. NAKO is the signatory on the bank account for Nakos Motors, INC. An analysis of the records revealed a number of transfers of funds between accounts

associated with KIMCA and his parents, D. NAKO, K. NAKO, and LAM during the period from January 2021 through December 2023:

      a.     Approximately $68,085 was transferred from accounts associated with KIMCA and his parents to accounts associated with D. NAKO, and approximately $64,524 was transferred in the other direction, from accounts associated with D. NAKO to accounts associated with KIMCA and his parents.

      b.     Approximately $13,350 was transferred from accounts associated with KIMCA and his parents to accounts associated with K. NAKO, and approximately $2,864 was transferred in the other direction, from accounts associated with K. NAKO to accounts associated with KIMCA and his parents.

      c.     LAM received approximately $356,515 from accounts associated from KIMCA and his parents during the period from July 2021 through October 2023. One of the transfers was a $15,000 wire transfer that referenced "watches" in the wire instructions.

      d.     LAM received approximately $371,529 from accounts associated with D. NAKO during the period from September 2022 through early January 2024.

      e.     LAM received approximately $23,097 from accounts associated with K. NAKO during the period from August 2022 through early January 2024.

83.    As noted above, for Undercover Purchase #3, Undercover Purchase #4, and Undercover Purchase #6, which were associated with D. NAKO, the return sender and address on the shipping labels listed Ardit Mesi at the Brooklyn Address. Law enforcement has not been able to identify any individual with the name Ardit Mesi living at the Brooklyn Address. However, LAM's New York driver's license, which I have reviewed, lists the Brooklyn Address as her residence.

84.    In addition, tracking information for each of the shipments revealed that five of the undercover purchases discussed above were shipped from post offices in Brooklyn, NY, and New York, NY. The watch from Undercover Purchase #1 (which is associated with KIMCA) was shipped from a post office six blocks from the Brooklyn Address, which is listed on LAM's driver's license.

85.    Three of the undercover purchases (Undercover Purchase #1, Undercover Purchase #4, Undercover Purchase #5) were shipped from postal kiosks in post offices where images of the shippers were available. The images showed what appeared to be the same woman shipping all three packages. Based on my training and experience and my review of LAM's driver's license photograph, I believe LAM is the woman who shipped the three packages.

86.    According to CBP records, from February 2021 to June 2021, CBP seized seven packages that were either addressed to LAM or the Brooklyn Address, which is listed on LAM's driver's license. CBP determined that the packages, collectively, contained approximately 378 counterfeit Rolex, Cartier, other luxury watches, which CBP estimated to have an MSRP of approximately $6.4 million.

<u>Shipping Account Records</u>

87.    During the investigation, law enforcement determined that KIMCA, D. NAKO, and K. NAKO utilized several online shipping management companies such as Pirate Ship, stamps.com ("Stamps"), and Shippo to facilitate the creation of shipping labels and manage the tracking of shipments.

88.    Records provided by Pirate Ship indicate the following:

a.    On February 26, 2021, an account was registered in KIMCA's name. From February 26, 2021, to April 26, 2023, the account was used to create approximately 3,947 shipping

labels. On September 27, 2022, a return address listing "Izzy" at the Brooklyn Address (which is the address listed on LAM's driver's license) was added to the account. On October 20, 2022, a return address listing "Watch Fluent" and the Brooklyn Address was added to the account. The Brooklyn Address was listed as the return address on 496 shipping labels created by this account from September 27, 2022, through April 26, 2023.

       b.      On February 1, 2021, an account was registered in D. NAKO's name. From February 3, 2021, to July 27, 2023, the account was used to create approximately 3,476 shipping labels. On October 20, 2022, a return address listing "Ardit Mesi" at the Brooklyn Address (which is the address listed on LAM's driver's license) was added to the account. As noted above, law enforcement has not identified any individual named "Ardit Mesi" living at the Brooklyn Address. The return address was labeled in the account in LAM's name and lists a phone number ending in 0198, which, as explained below, LAM told law enforcement was her phone number and is assigned to the SUBJECT DEVICE. The Brooklyn Address was listed as the return address on 1,369 shipment labels created by this account from October 20, 2022, through July 27, 2023.

       c.      On February 3, 2021, an account was registered in K. NAKO's name. From March 27, 2021, to December 12, 2023, the Pirate Ship account was used to create approximately 636 shipping labels, including the shipping label used to mail the package from Undercover Purchase #5.

       89.      Records provided by Stamps indicate the following:

       a.      On April 28, 2023, an account was registered in the name of one of KIMCA's parents. The account was used to create approximately 1,185 shipping labels, including the shipping label used to mail the packages from Undercover Purchase #1 and Undercover Purchase #2.

b.      On March 18, 2022, an account was registered in D. NAKO's name. From March 18, 2022, to March 21, 2022, the account was used to create 15 shipping labels.

90.      Records provided by Shippo indicate the following: on March 30, 2022, an account was registered in D. NAKO's name. From July 28, 2023, to December 19, 2023, the account was used to create approximately 943 shipping labels, including the shipping label used to mail the package from Undercover Purchase #3. All but two of those labels had a return address listing "Ardit Mesi" at the Brooklyn Address (which is the address listed on LAM's driver's license).

91.      USPIS analyzed USPS records based on information contained in records for the Shippo account in D. NAKO's name and the Pirate Ship account in K. NAKO's name. USPIS determined that from September 12, 2023, to December 19, 2023, approximately 369 packages associated with shipping labels created by those accounts were mailed from a USPS self-service kiosk, which are equipped with cameras. Based on a review of photographs captured by the kiosks, law enforcement believes LAM is the woman who shipped approximately 270 of those packages.

K. NAKO's Post-Arrest Statements to Law Enforcement

92.      Following K. NAKO's arrest and prior to his initial appearance in Court, K. NAKO signed a written waiver of his Miranda rights and agreed to be interviewed by law enforcement. During the interview, K. NAKO provided, in part, the following information:

a.      K. NAKO met LAM through his brother, D. NAKO.

b.      LAM was one of his main suppliers of watches.

c.      K. NAKO uses LAM to drop ship watches.

d.      K. NAKO typically communicates with LAM via text through Whatsapp. Based on my training and experience, I am aware that WhatsApp is a messaging service for mobile devices that enables users to chat directly or in groups using text, voice, and video.

e. K. NAKO also emails shipping labels to LAM. K. NAKO estimated he emailed LAM approximately five to ten times per week.

f. K. NAKO typically would pay LAM individually per watch unless he purchased multiple watches at a time. K. NAKO pays LAM through Cashapp and Zelle, I know from my training and experience that Cashapp and Zelle are peer-to-peer money transfer services that do not have physical locations. These services can be accessed by applications on mobile devices or by computer.

<u>Seizure of the SUBJECT DEVICE</u>

93. On or about February 27, 2024, LAM departed the United States for Hong Kong.

94. On or about the evening of April 5, 2024, LAM had a scheduled flight from Hong Kong arriving at John F. Kennedy International Airport ("JFK Airport") in Queens, New York. She arrived at JFK Airport at approximately 10:01pm on Cathay Pacific Flight #840. Upon arrival, LAM was stopped by CBP for a secondary inspection. LAM was in possession of the SUBJECT DEVICE. CBP took custody of the SUBJECT DEVICE pursuant to its border search authority and provided it to me. I then detained the phone pursuant to border search authority. The contents of the SUBJECT DEVICE were not reviewed or examined.

95. Two other law enforcement agents and I then interviewed LAM at JFK Airport. After signing a waiver of rights form, LAM confirmed that her phone number is the phone number, known to me, ending in 0198, which is the same phone number ending in 0198 that was saved as LAM's contact information in K. NAKO's phone, which law enforcement observed when it reviewed his phone at Logan Airport, as discussed above. She also confirmed that phone number is assigned to the SUBJECT DEVICE.

96.     During the interview, LAM denied having knowledge of the importation of sale of counterfeit goods. LAM stated she knows where they can be purchased in the Manhattan area of New York, but she stated she does not know where the counterfeit items come from. LAM indicated she lived in Brooklyn, New York, but denied living at the Brooklyn Address listed on her New York driver's license (which was the return address listed on some of the undercover purchases discussed above and online shipping accounts registered to KIMCA and D. NAKO). She stated that her friend lives at the Brooklyn Address, and LAM admitted that LAM uses that address to receive important mail.

97.     Based on the foregoing, there is probable cause to believe that the SUBJECT DEVICE contains communications between LAM and one or more of her co-conspirators relating to the SUBJECT OFENSES. There is also probable cause to believe that there will be other relevant evidence on the SUBJECT DEVICE, such as evidence of payments from her co-conspirators, evidence of what LAM did with the payments (i.e. proceeds of the SUBJECT OFFENSES), copies of shipping labels to mail the counterfeit watches, and evidence about where LAM obtained the counterfeit watches she supplied.

98.     The SUBJECT DEVICE is currently in the lawful possession of HSI in the Eastern District of New York and came into HSI's possession through lawful seizure pursuant to a border search, as set forth above. Therefore, while HSI might already have all necessary authority to examine the SUBJECT DEVICE, I seek this additional warrant out of an abundance of caution to be certain that an examination of the SUBJECT DEVICE will comply with the Fourth Amendment and other applicable laws. In my training and experience, I know that the SUBJECT DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in

substantially the same state as they were when the SUBJECT DEVICE first came into the possession of HSI.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

99.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

100.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic

evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.   I know that when an individual uses an electronic device to sell counterfeit goods, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

101.   *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

102.   *Manner of execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the

physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

103.    Based on the aforementioned factual information, I believe there is probable cause that the SUBJECT DEVICE constitutes and contains items that constitute evidence, fruits, and instrumentalities of the SUBJECT OFFENSES. Therefore, I respectfully request that this Court issue a search warrant for the SUBJECT DEVICE, as described in Attachment A, authorizing the seizure of the items described in Attachment B.

/s/ Stephanie Kooharian
_____
Special Agent Stephanie Kooharian
Homeland Security Investigations

Subscribed and sworn to before me by telephone on April 12, 2024.

*Taryn A. Merkl*
_____
HON. TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

<u>**ATTACHMENT A**</u>

**Property to Be Searched**

The property to be searched is a Samsung mobile phone with International Mobile Equipment Identity ("IMEI") number 350091128427189 (referred to herein and in Attachment B as the "SUBJECT DEVICE").

The SUBJECT DEVICE is currently located in the Eastern District of New York. This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

**Particular Things to be Seized**

The SUBJECT DEVICE and all records and information that constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 2320 (trafficking in and conspiring to traffic in counterfeit goods or services) and 18 U.S.C. § 1956 (money laundering) (collectively, the "SUBJECT OFFENSES") for the time period from February 1, 2021 through April 5, 2024, including the following:

1.      Images and videos depicting counterfeit watches;

2.      Records and information about the authenticity of counterfeit watches;

3.      Images, videos, and documents containing counterfeit trademarks for Rolex, Cartier, and any other manufacturer of watches;

4.      Supplier lists, ordering forms, price lists, catalogues, communications, and contact information regarding suppliers of counterfeit watches;

5.      Records and information related to the purchase, importation, sale, distribution, marketing, advertising, promotion, and inventory of counterfeit watches, including, but not limited to, the following: quotations; invoices; bills of sale; receipts; purchase records; sales records; waybills; customs declarations; import manifests; bills of lading; methods of shipment; tracking numbers for shipments; shipping labels and/or receipts; shipping documents; customer complaints; and communications regarding such records and information;

6.      Customer lists and any customer contact information for customers of counterfeit watches;

7.      Records and information related to websites and social media accounts used to sell counterfeit watches;

8.      Records and information related to the use of online shipping services such as Pirate Ship, Stamps.com, and Shippo;

9.      Records and information related to the use of payment services that can be used to transfer funds, including CashApp and Zelle;

10.     Communications with U.S. customs authorities, and any communications related to customs inspections and/or border seizures;

11.     Records and information about U.S. customs rules and regulations, and rules and regulations related to importing, selling, and distributing counterfeit goods and services;

12.     Records and information regarding foreign companies that manufacture or sell counterfeit goods;

13.     Records and information regarding the identity of other individual(s) who contacted or who were contacted by IZEDIN KIMCA, DENIS NAKO, KLEVIS NAKO, SI MAN LAM, or others in connection with the SUBJECT OFFENSES, including, but not limited to names, addresses, phone numbers, email addresses, usernames for social media or other means of electronic communication, financial account numbers, and internet protocol addresses;

14.     Records and information relating to the business, financial, and accounting activities of KIMCA, DENIS NAKO, KLEVIS NAKO,  SI MAN LAM and/or other co-conspirators, including, but not limited to, the following: general journals, subsidiary ledgers, receipt journals, disbursement journals and sales journals, accounts receivable, accounts payable, notes payable and closing ledgers, records of income and expenses, financial statements, balance sheets and income and expense journals, payroll records, bank statements, checks, check registers, deposit records, wire transfer records, withdrawal records, receipts, invoices, contracts, tax documents, credit card processing records, and/or other records showing the transfer of money

(including through Cashapp and Zelle);

15.    Evidence of who used, accessed, owned, or controlled the SUBJECT DEVICE;

16.    Evidence of software that would allow others to control the SUBJECT DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

17.    Evidence of the lack of such malicious software;

18.    Evidence indicating how and when the SUBJECT DEVICE was accessed or used, and evidence indicating the geographic location of the device when it was accessed or used;

19.    Evidence indicating the SUBJECT DEVICE user's knowledge and/or intent as it relates to the SUBJECT OFFENSES;

20.    Evidence of programs (and associated data) that are designed to eliminate data from the SUBJECT DEVICE; and

21.    passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT DEVICE.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

Pursuant to Rule 41(e)(2)(B), it is authorized that electronically stored information may be imaged or copied. Consistent with Rule 41(e)(2)(B), the warrant is deemed executed once the SUBJECT DEVICE has been physically seized, imaged, or copied, and that review of the contents of is permitted at a later time.